Westmoreland Manor, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Carbon County Home for the Aged, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

The County of Lehigh (Cedarbrook), Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued May 9, 1985, before Judges MacPhail, Barry and Palladino, sitting as a panel of three.

*Steven E. Bernstein*, with him, *Jeffrey B. Schwartz, Berriman & Schwartz,* for petitioners, Westmoreland Manor and Carbon County Home for the Aged.

*Susan M. Grant*, with her, *Lawrence J. Brenner, Solicitor, and Dennis G. Charles,* for petitioner, County of Lehigh (Cedarbrook).

*Bruce Baron*, with him, *Jason W. Manne,* Assistant Counsel, for respondent.

Opinion by Judge MacPhail, August 15, 1985:

In these consolidated appeals, Petitioners[1] challenge an order of the Secretary of the Department of Public Welfare (Secretary) which upheld the determination of the Office of the Auditor General (Auditor General) of the final audited rates of reimbursement to which Petitioners were entitled for fiscal years ending 1978 and 1979. We affirm.

Petitioners are county nursing homes which provide skilled nursing and intermediate care services to Medicaid patients pursuant to the Pennsylvania Medical Assistance Program (Program). During a fiscal year, county homes receive interim payments to provide for required Program services. These interim payments provide the facilities with a steady cash flow for the fiscal year. At the end of the fiscal year, the accounts are audited by the Auditor General and an appropriate adjustment is then made for over or under payments based upon reimbursement rates determined by the Department of Public Welfare (DPW), the agency authorized to administer the Program. For the fiscal years in question, DPW applied a statewide per diem ceiling of $42,000 to Petitioners' operating costs in determining the amount of reimbursement to which they were entitled. This resulted in a determination that Petitioners had been overpaid. Petitioners contend that their reimbursement should have been determined on the basis of the interim rates that had been established for each facility prior to July 1, 1978.

DPW adopted a "Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities" (Manual), published at 5 Pa. B. 2928-34 (1975). The Manual was revised to conform with

---

[1] Petitioners are Westmoreland Manor, the Carbon County Home for the Aged, and the County of Lehigh (Cedarbrook).

158

DPW's plan to implement cost-related reimbursement for private and public skilled nursing and intermediate care facilities on July 1, 1976, published at 6 Pa. B. 1497-1503 (1976).[2] Relevant portions of the revised Manual read:

§9424.712 Payment to Private Nursing Facilities

. . . .

The cost-related reimbursement system is based on the following factors: (1) recognized allowable audited direct or indirect patient care costs based on certain cost principles and standards (2) interim facility per diem rate ceilings within a maximum per diem rate ceiling (3) a state-wide average participation allowance for proprietary and non-profit facilities within established ceilings (4) an annual Financial and Statistical Report based on a facility's fiscal year subject to audit to determine allowable costs in accordance with the [Manual] . . .

An interim per diem private facility rate, based on allowable costs will be established . . . within group per diem ceilings.

. . . .

§9424.713 Payment to Public Nursing Facilities

A county home will be reimbursed the applicable Federal share of the Medical Assistance per diem rate . . . and any State share . . . of allowable costs defined and allocated in accordance with the provisions of the [Manual]. *The ceilings in the Manual are not applicable to coun-*

---

[2] Amendments to Title XIX of the Federal Social Security Act (Act), 42 U.S.C. §1396a, mandated that Medical Assistance payments to skilled nursing and intermediate care facilities be made on a cost-related basis after July 1, 1976.

*ty facilities* until full costs are reimbursed through Federal and State funds. (Emphasis added.)

The provisions for paying full costs to state and county public operated facilities and imposing ceilings upon rates paid to most private facilities were found to be in violation of federal regulations requiring one cost finding method to be used by all providers. Federal regulations allowed variances only by the type of facility *i.e.*, intermediate or skilled care, and not by type of ownership. Because of the distinction between private facilities and county facilities, the federal government would not approve the Program. DPW subsequently revised the Manual, effective October 1, 1978, in order to bring the Program into compliance with federal regulations. 8 Pa. B. 2826-2838 (1978).[3] These revisions provided in part that county facilities would now be subject to a ceiling based on the statewide weighted average per diem cost of such facilities. The new regulations also specified the following:

Interim payments to County Homes will be established by the Department based on the reported net operating costs subject to the statewide weighted average per diem net operating cost ceiling plus depreciation and interest and special supportive services allowances. The interim payments will be subject to annual payment adjustment based on audited certified costs, and within the net operating ceiling plus special allowances. *In the application of the ceilings to individual facilities, in no case will the per diem payment to a facility be less than the interim rates that were in effect prior to*

---

[3] Implementing Federal regulations were published at 41 Fed. Reg. 27300-27307 (1976) (codified at 45 C.F.R. §250.30).

*July 1, 1978* (grandfather clause). (Emphasis added.)[4]

It is the application of this grandfather clause that is at the center of the dispute.

The Auditor General, at the time of final audit,[5] applied the statewide per diem ceiling to Petitioners' operating costs and determined that there had been an overpayment of medical assistance reimbursement. The Petitioners appealed these adjustments and a fair hearing was held.

Before the hearing officer, Petitioners asserted that the grantfather clause required audited per diem rates to be no less than the interim rates that were in effect prior to July 1, 1978, and argued that the phrase "per diem payment" in the grandfather clause meant the same thing as "final" or "audited" per diem payment. Petitioners argued that the ceilings were not to be applied at the time of final audit. It was DPW's position that the grandfather clause dealt solely with interim rates and was not to be applied at the time of final audit. This interpretation requires that the statewide ceilings be applied at final audit.

The hearing officer received testimony by Mr. Raul, an employee of the Auditor General responsible for reviewing Program reimbursement claims. Mr. Raul testified to the effect that the Auditor General only had responsibilities with respect to final per diem payments and that the Auditor General had been

---

[4] An identical grandfather clause was included in Section 9425.912 of the Manual. Section 9425.912 concerns payment to county facilities for intermediate care facility services.

[5] At issue are Cedarbrook's audit for the period October 1, 1978 —December 31, 1978 and for the fiscal year January 1, 1979—December 31, 1979; Westmoreland Manor's audit for the fiscal year January 1, 1979—December 31, 1979; and the audit of Carbon County Home for the Aged for January 1, 1979—December 31, 1979.

notified by DPW to apply the grandfather clause "literally". The Auditor General interpreted this memo to mean that the grandfather clause applied at the time of final audit.

DPW argued that the purpose of the grandfather clause was to ease the transition from full reimbursement to reimbursement subject to ceilings, explaining that at the time the ceilings were implemented, the fiscal year (and consequently a working budget) had already begun. DPW maintained that the grandfather clause was specifically directed to not disrupting the county facilities' cash flow.

On February 23, 1983, on the basis of the recommendation and findings of the hearing officer, the Office of Hearings and Appeals sustained Petitioners' claims for reimbursement. The hearing officer held that the phrase "per diem payment", which is not defined anywhere in DPW regulations, was meant to apply to final per diem payments. The hearing officer relied on Mr. Raul's testimony, reasoning that "any instructions issued by the Department to the Office of the Auditor General relating to per diem payments cannot relate to the determination of *interim* per diem payments, but only to the determination of *final* per diem payments." Hearing Officer's Adjudication at pp. 4-5 (emphasis in original). The hearing officer recommended that the grandfather clause be interpreted to mean that the interim per diem rates of individual county facilities were the ceilings for the period at issue notwithstanding reference to a statewide ceiling.

DPW requested reconsideration of the Office of Hearings and Appeals decision. The Secretary reversed, reasoning that DPW's explanation of the purpose and intent of the grandfather clause was completely consistent with the requirement of statewide

ceilings. The Secretary also noted that DPW's interpretation benefited Petitioners in that their cash flow for the fiscal year was maintained and Petitioners had the use of these overpayments for several years. The Secretary then held that because the regulations and the State Plan provided for the application of a single ceiling based on the statewide weighted average per diem cost of county nursing facilities, the order of the Office of Hearings and Appeals must be reversed. The instant appeals followed.

In reviewing DPW's interpretation of its own regulation, our analysis is two-fold: we first determine if DPW's interpretation is plainly erroneous or inconsistent with the regulation; we then determine if the regulation is consistent with the statute under which it is promulgated. *Department of Public Welfare v. Forbes Health System*, 492 Pa. 77, 422 A.2d 480 (1980).

Both Petitioners and the DPW make essentially the same arguments here on appeal that they made to the hearing officer. DPW submits that the grandfather clause was intended to maintain cash flow to the county facilities which had already prepared their budget without taking into account the possibility of ceilings on reimbursements. The grandfather clause permitted these interim payments to remain stable, so that the county facilities would have their expected working capital. The statewide ceilings, however, would be applied at final audit in determining each facility's final audited per diem payment.

In support of its position, DPW points to the official comments published when it proposed an amendment to delete the grandfather clause:

3. When ceilings were set for county facilities in October 1978, the Department recognized that county institutional Districts had

established their budgets for fiscal year 1979 and accordingly the regulations included a provision to ease the transition from full allowable reimbursement to statewide ceilings.

10 Pa. B. 995 (1980). When this amendment was adopted, DPW summarized the comments received during the comment period:

> *Comment*—'A nursing home that budgeted for 1980 may have to reduce services to stay within its budget, because the grandfathering clause in §9424.713 has been eliminated.'
>
> *Response*—The grandfathering clause was placed in the regulations only as a temporary measure to help county homes make the transition from the full allowable reimbursement system used before October 1978 to the present system based on statewide ceilings.

10 Pa. B. 3106 (1980).[6] Petitioners contend that DPW may not use an "after-the-fact" interpretation to support its current position, citing *Forbes Health Systems v. Harris,* 661 F.2d 282 (3d Cir. 1981). In *Forbes (3d Cir.),* the Court refused to accept DPW's 1978-80 interpretation of a 1973 regulation which departed from DPW's consistent practice from 1973 to 1978-80:

> Where an agency's 1978-80 interpretation of a 1973 regulation flatly contradicts that agency's consistent practice from 1973 to 1978-80, the

---

[6] Section 1939 of the Statutory Construction Act of 1972, 1 Pa. C. S. §1939 provides that:

The comments or report of the commission, committee, association or other entity which drafted a statute may be consulted in the construction or application of the original provisions of the statute if such comments or report were published or otherwise generally available prior to the consideration of the statute by the General Assembly, but the text of the statute shall control in the event of conflict between its text and such comments or report.

1978-80 interpretation should not prevail. Here, the 1978-80 interpretation appears to involve an after-the-fact attempt by the agency to alter the meaning of its own regulation, and we will therefore rely not on the 1978-80 interpretation, but rather on the agency's own practices between 1973 and 1978-80.

*Id.* at 286. In contrast to *Forbes (3d Cir.)*, we have here no evidence that DPW's published interpretation contradicts DPW's application of the grandfather clause. To the contrary, it is the fact that DPW has applied the grandfather clause consistent with its interpretation that is at the center of this dispute.

Much of the problem in interpreting the grandfather clause results from the fact that it is the Auditor General which audits county facilities' costs. Petitioners rely on the fact that the Auditor General's interpretation and consequent application of the grandfather clause differ from DPW's interpretation. Petitioners find significance in the fact that the Auditor General applied the grandfather clause at final audit. Petitioners also rely upon a November 26, 1979 memorandum issued by DPW to the Auditor General. This memorandum stated, in pertinent part, that:

This is in response to your staff inquiries concerning the application of the following to County Facilities:

1) *Net Operating Cost Ceiling*

Section 9424.713 of the Department's Regulations which states, 'In the application of the ceilings to individual facilities, in no case will the per diem payment to a facility be less than the interim rates that were in effect prior to July 1, 1978,' is to be taken literally for the

period October 1, 1978, through December 31, 1979.

According to Petitioners, because the Auditor General's responsibilities concern exclusively county facilities final audits and not interim per diem rates, the memorandum required that "per diem payment" be interpreted to mean "final audited per diem payment." We do not agree.

It is a well known rule of statutory construction that sections of a statute or regulation must be construed with reference to the entire section or statute. *See Snyder v. Department of Transportation,* 64 Pa. Commonwealth Ct. 599, 441 A.2d 494 (1982). *See also Department of Public Welfare v. Woolf,* 276 Pa. Superior Ct. 433, 438, 419 A.2d 535, 537-38 (1980) ("In interpreting a statute, it must be construed as an integral part of the whole structure affected and not a separate matter having an independent meaning of its own.") Thus, the grandfather clause must not be read out of context.

The grandfather clause is the last sentence in a paragraph solely concerned with interim payments.[7] The sentence immediately preceding the grandfather clause states that these interim payments will be subject to annual adjustments[8] within ceiling levels. This sentence, in our view, clearly implies that the ceilings

_____

[7] "Interim payments" are defined in the Manual as "reimbursement for Medical Assistance patients by the Department to the facility based on the interim per diem rate." 5 Pa. B. 2928, 2929 (1975). "Interim per diem rate", in turn, is defined as "[t]he rate established by the Department during the current year, based on the facility's prior year's audited per diem cost plus a participation allowance for interim reimbursement to a facility." *Id.* "Per diem rate" is defined to be the same as interim per diem rate. *Id.* at 2930. As already noted, the Manual does not define "per diem payment."

[8] "Annual adjustments" are defined in the Manual to be "[t]he difference between the interim payments during the year to the fa-

are to be applied at the time of final audit. DPW's application of the grandfather clause properly interprets this interim payment section as a whole. To construe the grandfather clause as applying to final audited per diem payments ignores the import of the entire paragraph: regardless of the application of statewide ceilings at the time of final audit, the interim payments will be at the same rate as those interim payments made prior to July 1, 1978. We therefore hold that DPW's interpretation is not plainly erroneous or inconsistent with the regulation.

Our focus now turns to whether the regulation is consistent with the statute under which it is promulgated. The Manual amendments were promulgated pursuant to the authority contained in Sections 403 and 443.1(3) of the Public Welfare Code (Code), Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S.§§403 and 443.1(3). Section 403 requires, *inter alia,* that DPW must maintain uniformity in the administration of general welfare. Section 443.1(3) states, *inter alia,* that the cost of skilled and intermediate nursing care for county homes shall be as specified by DPW regulations adopted under the Act, the enabling federal legislation which funds the Program. When the Act mandated that medical assistance payments to skilled nursing and intermediate care facilities be made on a cost related basis, implementing federal regulations were published at 41 Fed. Reg. 27300-27307 (1976). These proposed regulations stated, in pertinent part:

§250.30   Reasonable charges.

(a)   State plan requirements.

. . . .

(3)   Effective July 1, 1976, provide for payment of the skilled nursing facility and in-

cility and the actual audited allowable per diem costs at the end of the facility's fiscal year." 5 Pa. B. 2928, 2929 (1975).

termediate care facility services provided under the plan on a reasonable cost-related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost finding methods approved and verified by the Secretary.

. . . .

(i)(C) Specify one cost-finding method approved by the Secretary to be used by *all* providers of skilled nursing facility services, and one cost-finding method approved by *all* providers of intermediate care facility services . . . .

(iv) The State plan shall set forth the methods and standards used by the State to determine reasonable cost-related payment rates on the basis of such methods. . . . The State plan shall provide:

(A) Methods and standards that reasonably take into account actual costs of the items of allowable costs. . . . (Payment rates shall not be set lower than the level which the State reasonably finds, or in the case of a prospectively determined rate, the level which the State reasonably expects, to be adequate to reimburse in full such actual allowable costs of a facility that is. economically and efficiently operated). . . . (Emphasis added.)

The discussion section of the federal regulations interpreted "reasonable cost-related basis" to mean that "after determining the reasonable cost on the basis of some approved method, the State must set a payment rate that it finds adequate to reimburse such reasonable costs, and could not set the rate so low that it clearly would not reimburse such reasonable costs." 41 Fed. Reg. 27300, 27302 (1976). The report continued that States have great freedom in determining

a reasonable cost-related payment rate which takes into account incentives toward efficiency and economy on the one hand, and incentives to upgrade the quality of care and to provide for growth and improvements on the other hand. *Id.* at 27303.

Petitioners do not, because they cannot, argue that the statewide ceilings do not reflect the Commonwealth's determination of what constitutes "payment on a reasonable cost-related basis." It further appears that since the thrust of the Federal regulations was to require a uniform rate for *all* providers, the grandfather clause is consistent with those regulations and with the provisions of the Code under which they were promulgated.

Given that an agency's interpretation of its own regulations is entitled to considerable weight, *Spicer v. Department of Public Welfare,* 58 Pa. Commonwealth Ct. 558, 428 A.2d 1008 (1981), and that our scope of review is limited to a determination of whether the Secretary's adjudication is in accordance with the law, any constitutional rights were violated, or the findings of fact were not supported by substantial evidence, *Clingerman Nursing Center v. Department of Public Welfare,* 73 Pa. Commonwealth Ct. 470, 458 A. 2d 653 (1983), we will affirm the order of the Secretary.[9]

### Order

The order of the Commonwealth Secretary of Public Welfare is affirmed.

---

[9] Petitioners cite 55 Pa. Code §275.4(h)(4)(ii) for the proposition that the Secretary did not have the authority to reverse the hearing officer's factual determination of the intent of the grandfather clause. This section of the Code addresses the rights of medical assistance recipients and is therefore inapplicable to the instant case.