528 A.2d 1008

Fair Acres Geriatric Center, et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued December 8, 1986, before Judges DOYLE and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Gerald Gornish*, with him, *Jeffrey B. Schwartz, Steven E. Bernstein*, and *Brenda J. Glaser-Abrams, Wolf, Block, Schorr and Solis-Cohen*, for petitioners.

*Bruce G. Baron*, Assistant Counsel, for respondent.

*Howard M. Louik*, Assistant County Solicitor, with him, *James F. Nowalk*, Assistant County Solicitor, and *James J. Dodaro*, County Solicitor, for Amicus Curiae, Allegheny County Institution District.

OPINION BY JUDGE PALLADINO, July 10, 1987:

Fair Acres Geriatric Center, the Delaware County nursing home, along with the county nursing homes of Lehigh, Westmoreland, Chester, Carbon and Mercer Counties (collectively Petitioners), appeal an order of the Department of Public Welfare (DPW). The order denied Petitioners' appeal concerning the amount of their reimbursements under the Pennsylvania Medical Assistance (MA) Program for one or more fiscal years ending December 31, 1978, 1979 and 1980. We affirm.

Audit adjustments were made by the Office of the Auditor General (Auditor General) for the fiscal years in question which significantly reduced the amount Petitioners received in their MA program reimbursements.[1]

---

[1] The amounts of the reductions were:

| Home | Amount | Fiscal Year |
|------|--------|-------------|
| Fair Acres | $ 94,663 | 1979 |
| Westmoreland Manor | 68,816 | 1979 |
| | 121,266 | 1977 & 1978 |
| Cedarbrook | 67,402 | 1980 |
| (Lehigh County) | 72,784 | 1979 |
| | 77,045 | 1978 |
| Cedarbrook-Fountain Hill | | |
| (Lehigh County) | 47,593 | 1980 |
| | 32,255 | 1979 |
| | 34,395 | 1978 |

The adjustments were the inclusion of the costs of services provided by salaried physicians which had been billed under Medicare Part B Program and the offset of the revenue received by Petitioners from the Medicare Part B Program for these services. Petitioners appealed the adjustments to DPW's Office of Hearings and Appeals (OHA). Hearings were held before an OHA hearing officer on October 21 and 27, 1982 and January 13 and February 9, 1983. The hearing officer recommended the appeals be denied; the Director of the OHA denied the appeals on June 13, 1985. Petitioners filed a petition for review with this court on July 13, 1985.

Petitioners are county owned and operated nursing homes. They are certified by DPW as providers of skilled nursing facility (SNF) and intermediate care facility (ICF) services under the Pennsylvania MA Program.[2] Prior to October 1, 1978, certified county facilities were reimbursed for the services provided to eligible MA recipients for the full amount of allowable costs, while reimbursements to private certified facilities were subject to a ceiling. In 1977-78 the federal government notified DPW that it could not continue to impose a net operating cost reimbursement ceiling on private facilities unless the county facilities were also made subject to a ceiling.

The county facilities anticipated that the ceilings would have an adverse impact on the amount of reim-

---

| Pocopsin | 70,627 | 1979 |
| (Chester County) | | |
| Carbon County | 10,971 | 1980 |
| Mercer County | 23,549 | 1980 |

N.T. at 7-9 (October 21, 1982 hearing).

[2] The MA Program is the method used by Pennsylvania to implement the Medicaid system established by the federal government in 1965, 42 U.S.C. §§1396-1396p, and it is administered by DPW pursuant to Section 201 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §201.

bursement they would receive. A number of discussions were held with DPW representatives in which an attempt was made to determine if there were any unique support services provided by the county facilities, and not by the private facilities, the costs of which could be "passed through" *i.e.* not be subject to the ceiling. Petitioners determined that one method of maximizing the amount of reimbursement would be to isolate the costs of services provided by salaried physicians for which Medicare Part B reimbursement was available, bill them to Medicare, and exclude these costs and any revenue received from their "Financial and Statistical Annual Report" (annual report) required to be filed with the Auditor General. The result, assuming the remaining allowable costs were higher than the ceiling, would be that Petitioners would receive the maximum reimbursement allowable under the MA program plus the Medicare Part B reimbursement. (This is termed the "exclusion" method.)

On October 13, 1978, DPW issued regulations implementing the MA net operating cost reimbursement ceilings for county facilities retroactive to October 1, 1978. 8 Pa. B. 2826 (1978). In December 1978, the county facilities requested Glenn Johnson, Director of DPW's Bureau of Medical Assistance, to clarify DPW's policy on Medicare Part B services. On December 22, 1978 Johnson issued a letter which contained the following statement:

> [C]larification has been requested by some Homes [county facilities] on the application of Medicare Part B income for physician services or other ancillary services. As a general rule, the costs related to Medicare Part B services are to be excluded from total costs of the facility. Further technical discussion of this subject will occur at the January 5 meeting.

Appellant's Exhibit 3 (October 21, 1982 hearing).

Petitioners interpreted this statement to mean the exclusion method would be appropriate. They enrolled as participants in the Medicare Program and used the exclusion method on their annual reports to the Auditor General. In December 1981, the Auditor General issued its audit of Fair Acres 1979 annual report in which the costs of services provided by salaried physicians covered by Medicare Part B were included as allowable costs and the Medicare Part B revenues were deducted from the MA reimbursable costs. (This is termed the "offset" method.) This resulted in Fair Acres being reimbursed less than the ceiling amount even though their total allowable costs remained greater than the ceiling. The other Petitioners' annual reports were treated similarly.

Petitioners make no argument on appeal that the regulations do not provide for use of the offset method in regard to Medicare Part B costs and revenues for services provided by salaried physicians.[3] They contend

---

[3] An *amicus curiae* brief on behalf of Petitioners was filed by the Allegheny County Institution District. *Amicus* argues that DPW regulations *require* the exclusion method for all Part B Medicare costs and revenues in determining MA reimbursement, and, therefore, Medicare Part B reimbursable physicians services may not be included in MA reimbursement, even if the physicians are salaried. *Amicus* cites Section IV F.4. of the "Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities" (MACR), 8 Pa. B. 2832, 2837 (1978), in support of this argument. However, Section II of the MACR expressly excepts "facilities providing care to dependent persons operated by County Governments and County Institutional Districts" from the MACR's provisions. 8 Pa. B. 2832, 2833 (1978). The amendments to regulations §§9424 and 9425 of the Medical Assistance Manual (MA Manual), adopted the same day as the MACR—October 14, 1978, clearly separate the county facilities from other general nursing facilities by referring to "county nursing facilities" and "general nursing facilities." *E.g.* §§9424.713, 9424.716, 9425.912, 9425.915. We also note that this interpretation was not advanced below and there is no support for it in the record.

that (1) DPW's policy at the time the ceiling system for the reimbursement to county facilities was implemented was to permit the counties to use the exclusion method, and even if it wasn't, they reasonably relied, to their detriment, on representations from DPW that the exclusion method was proper and, therefore, DPW should be estopped from applying the offset method. DPW argues that the regulations in effect during the fiscal years in question required the offset method, and that Petitioners were not misled to believe the exclusion method was appropriate.[4]

## METHOD REQUIRED BY REGULATIONS

The rate of reimbursement to Petitioners under the MA Program for the fiscal years in question consisted of three components: (1) net operating cost, subject to ceilings; (2) depreciation costs, subject to limitation; and (3) interest costs, subject to limitation. Medical Assistance Manual (MA Manual) §§9424.713, 9425.912, 8 Pa. B. 2828, 2831 (1978).[5] This case is concerned with the

---

*Amicus* also contends that offsetting Medicare Part B revenues from salaried physician services is inconsistent with the requirements of the Medicare Program, 42 U.S.C. §§1395-1395zz. There is nothing in the record concerning this issue, and it does not appear in the statement of questions involved in Petitioners' brief nor is it addressed in Petitioners' brief. Therefore, we will not consider it. Pa. R.A.P. 2116(a); *See Eisenberg v. Department of Public Welfare,* 86 Pa. Commonwealth Ct. 358, 485 A.2d 511 (1984).

[4] Our scope of review is limited to a determination of whether the decision is supported by substantial evidence, is in accordance with the law and whether any constitutional rights were violated. *Harston Hall Nursing and Convalescent Home, Inc. v. Department of Public Welfare,* 99 Pa. Commonwealth Ct. 475, 513 A.2d 1097 (1986).

[5] *See Westmoreland Manor v. Department of Public Welfare,* 91 Pa. Commonwealth Ct. 155, 496 A.2d 1282 (1985) for a description of the change in reimbursement for county facilities from total allowable cost to total allowable cost subject to a ceiling.

proper method of handling Medicare Part B payments made to the facilities for services performed by salaried physicians in the computation of the net operating cost under the regulations in effect for the fiscal years 1978 through 1980. DPW's interpretation of its own regulations must be upheld as long as the interpretation is consistent with the regulations and is not plainly erronerous. *Department of Public Welfare v. Forbes Health System,* 492 Pa. 77, 422 A.2d 480 (1980).

Section 9424.72 of the MA Manual provided, in pertinent part:

> *Payment for Physicians' Services Related to*
> *Nursing Facility Care and Services*
>
> Reimbursement is made to private practicing physicians without prior authorization for necessary medical treatment provided a patient in a skilled nursing facility. . . .
>
> *Physicians who are salaried employees* of the nursing facility *will not be reimbursed* for any professional services provided Medical Assistance patients in that facility, since *such costs are included in the Department's daily rate.* (Emphasis added.)

The cost of the services provided to MA recipients by salaried physicians was therefore a covered service and an allowable operating cost under the MA Program. Section 1406(c) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §1406(a) provides that payment made under the MA Program constitutes full payment for covered services. As of October 1, 1978 a ceiling was applied to the amount which would be reimbursed for net operating costs. MA Manual §§9424.713 and 9425.912; *Westmoreland Manor v. Department of Public Welfare,* 91 Pa. Commonwealth Ct. 155, 496 A.2d 1282 (1985). The payments to the county facilities were computed "on the basis of the es-

tablished rate times the number of compensable days, less the amount of resources available to the patient, as set forth in §9223.32." MA Manual §§9424.716, 9425.915. (The established rate for Petitioners was the ceiling rate for net operating costs plus their depreciation and interest expense.)

Section 9223.32 required that all resources of a patient be considered available to meet the cost of care in the county facilities, with certain exceptions which do not include Part B Medicare payments. MA Manual Section 9223.4212 defined the health insurance provided under Medicare[6] as a resource and specifically stated that Medicare Part B provides insurance for physician services to MA eligible recipients who were automatically enrolled in the Medicare Part B Program by DPW.

Therefore, the regulations were properly interpreted as requiring (1) the costs of services provided by salaried physicians to be included on the county facilities' reports and (2) any Medicare Part B payments received by Petitioners for these services to be deducted from the amount of the "established rate times the number of compensable days" in computing the payment to be made to Petitioners for the fiscal years in question.[7]

## DPW's Intent

Petitioners argue that DPW intended to use the "exclusion" method and that the use of the "offset" method when the annual reports were audited is an af-

---

[6] *Medicare health insurance is composed of two components. Part A is hospital insurance and Part B is medical insurance.*

[7] Current DPW regulations allow the county facilities, and all other certified providers of nursing facility care, two options for handling Medicare Part B services which the facilities itself provides. 55 Pa. Code §1181.254. Option 1 is the "exclusion method"; option 2 is the "offset" method. *Id.*

ter the fact change of policy which must be disregarded. In support of this contention, Petitioners rely on the statement in Glenn Johnson's December 22, 1978 letter that "[a]s a general rule, the cost related to Medicare Part B services are to be excluded from total costs of the facility."

The hearing officer found that this statement addresses the *general rule* for Medicare Part B *costs* and gives no direction as to the treatment of Medicare Part B *revenues*. Petitioners contend this finding is not supported by substantial evidence in the record.

Petitioners make a number of claims in support of this contention. Initially, Petitioners cite the testimony of Gerald F. Radke, DPW Secretary of Medical Assistance, in response to a question of how a facility which excluded costs of physician services billed to Medicare Part B would handle the income from these services. Radke answered: "The facility would have *taken upon itself* to remove from the cost report all costs associated with the Part B service, and therefore, would expect, rightfully so, to receive all income related to the Part B services." N.T. at 36 (February 9, 1983 hearing) (emphasis added). Petitioners have taken this statement out of context. Radke qualified the above statement by explaining: "Unfortunately, for the facility, *our regulations do not allow* a facility to make the choice to unilaterally use the exclusion method. *We require them to use the Medicare Part B payment as a patient resource." Id.* (emphasis added).

Petitioners next argue that MA Manual Section 9424.72 does not provide an exception to the general rule that Medicare Part B costs were excludable. They contend that DPW's interpretation of it as an exception is no more than an attempt to justify an after the fact change in policy. Petitioners rely on the fact that §9424.72 does not contain any reference to Medicare

Part B. Since we have concluded that DPW's interpretation of this regulation is consistent with its regulations dealing with MA Program reimbursement, this argument is moot.

Petitioners also rely on DPW's expressed intention to attempt to provide relief to the county facilities from the economic hardship expected to be incurred as a result of the imposition of the net operating costs ceiling, N.T. at 37-47, 54-61 (October 21, 1982 hearing), to support their claim that DPW's intent, expressed in Johnson's letter, was to allow them to use the exclusion method. However, the DPW witness additionally testi--fied that no specific policy, regulation or procedure was adopted which would allow any costs to be passed through. N.T. at 64 (October 21, 1982 hearing).

Lastly, Petitioners claim that the adoption of the exclusion method as an option for dealing with Medicare Part B services on August 6, 1983, 13 Pa. B. 2402 (1983), 55 Pa. Code §1181.854, is evidence that DPW's explanation of Johnson's letter is an after the fact repudiation of the exclusion method. Petitioners cite *Forbes Health Systems v. Harris,* 661 F.2d 282 (3d Cir. 1981) to support their claim that when a current interpretation contradicts prior practice, it must be disregarded.[8] However, DPW has not applied any interpretation of the regulations to the county facilities annual reports other than the offset method.[9]

---

[8] In *Harris,* DPW sought to interpret a regulation as having an "implicit" requirement when for five prior years the regulations had been applied without this requirement. The *Harris* court held that "[w]here an agency's 1978/80 interpretation of a 1973 regulation flatly contradicts that agency's consistent practice from 1973 to 1978/80, the 1978/80 interpretation should not prevail," but also held that "there was not, never has been, and is not now any implicit . . . requirement in the regulations governing the reimbursement of nursing homes." *Id.* at 286.

[9] The record contains evidence of one instance in which the Auditor General accepted a 1979 annual report using the exclusion

We conclude that the hearing officer's finding is supported by substantial evidence. DPW did not intend to use the exclusion method for Medicare Part B costs and revenue related to services provided by salaried physicians at the time the net operating costs ceiling was imposed.

## ESTOPPEL

Petitioners contend that the hearing officer erred in concluding that they had failed to establish the grounds for the application of the doctrine of equitable estoppel. Equitable estoppel is basically a doctrine of fundamental fairness, the application of which depends on the facts of each case. *Central Dauphin School District v. Department of Education*, 63 Pa. Commonwealth Ct. 48, 437 A.2d 527 (1981). The doctrine arises "when a party has intentionally or negligently misrepresented some material fact, knowing or having reason to know that another will justifiably rely on that misrepresentation, and where that other has been induced to act to his detriment because he did justifiably rely on that representation." *Id.* at 55, 437 A.2d at 530. DPW contends that equitable estoppel, while appropriate to prevent the application of procedural requirements, should never be used to permit a provider to receive more in payment from public funds than the law allows. We need not reach that issue because we conclude that

method. Appellant's Exhibit 14 (October 21, 1982 hearing). However, a revised audit report was subsequently issued by the Auditor General using the offset method. Appellant's Exhibit 16 (October 21, 1982 hearing). As this court held in *Mansion Nursing and Convalescent Home v. Department of Public Welfare*, 96 Pa. Commonwealth Ct. 143, 146, 506 A.2d 533, 534 (1986), "[a]lthough the Commonwealth may have committed error earlier, that error does not later prevent it from acting in accordance with the law."

the hearing officer was correct in determining that Petitioners had failed to establish the elements of estoppel.

> To establish estoppel Petitioners must show:
> (1) misleading words, conduct, or silence by the party against whom the estoppel is asserted;
> (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel;
> (3) no duty of inquiry on the party seeking to assert the estoppel.

*Divine Providence Hospital v. Department of Public Welfare,* 76 Pa. Commonwealth Ct. 188, 192-93, 463 A.2d 118, 120 (1983). The allegedly misleading words on which Petitioners claim to have relied to their detriment are those in Glenn Johnson's letter setting out the general rule for dealing with Medicare Part B costs. The hearing officer found that "Mr. Johnson simply did not misrepresent anything." As we previously concluded (1) there is substantial evidence in the record to support the hearing officer's finding that Johnson's statement correctly stated the general rule for Medicare Part B costs and gave no direction as to Part B Medicare revenues, and (2) DPW did not intend to use the exclusion method. Therefore, Petitioners have failed to establish the first element.

Additionally, even assuming Petitioners were misled by Johnson's letter, they have failed to establish reasonable reliance on that letter. Petitioners asserted during the hearings that they would not have undertaken the administrative burdens associated with enrollment and participation in the Medicare Program but for their belief that Johnson's letter indicated they could exclude the revenues received from their cost reports. However, MA Manual §9424.711 required that Medicare benefits, if available, be utilized prior to MA Program benefits. There can be no detriment incurred as the result of rea-

sonable reliance when the Petitioners were already legally required to utilize the resource. Petitioners have failed to prove the second element.

Lastly, we note that the hearing officer also found that Petitioners "did not seek clarification of the 'general rule' mentioned in the letter so as to define with any certainty what the qualifications of the rule were and whether or not the 'general rule' treated of income as well as costs." The record contains substantial support for this finding. *See* N.T. at 98-99 (October 21, 1982 hearing). Petitioners, as certified providers, are charged with knowledge of the applicable DPW regulations. *Divine Providence.* They, therefore, had a duty to inquire about (1) the discrepancy between the "general rule" and the regulations indicating that the costs of physician services provided by salaried physicians were included in daily rate and (2) the absence of reference to Medicare Part B revenue in the letter when the regulations defined this as a resource to be deducted from the amount payable to the provider. Petitioners have, therefore, also failed to establish the third element of estoppel.

Accordingly, we affirm.

## ORDER

AND NOW, July 10, 1987, the decision of the Department of Public Welfare in the above-captioned matter is affirmed.